**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Dori Holmes,                    )
                                )
         Plaintiff,             )    Case No. 1:07-CV-695
                                )
     v.                         )
                                )
U.S. Bank, <u>et al.</u>,       )
                                )
         Defendants.            )

O R D E R

        This matter is before the Court on Defendants' motion
to dismiss (Doc. No. 27).  In their motion, Defendants move to
dismiss the complaint with prejudice on the grounds of
Plaintiff's alleged misconduct in the course of litigating this
case.  Plaintiff's alleged misconduct concerns three areas: 1)
willful failure to produce documents requested during discovery
and being untruthful about her document production during
discovery; 2) attempted bribery of a witness; and 3)
falsification of her employment application as well as being
untruthful about her prior employment history during her
deposition.  The Court held an evidentiary hearing on Defendants'
motion on April 6, 2009 during which Elizabeth Byrd and Dan
Nocella testified. Doc. No. 72.  Plaintiff did not testify during
the hearing nor has she proffered an affidavit in response to
Defendants' allegations.  Plaintiff requested and was given an
opportunity to file a supplemental post-hearing brief addressing

1

whether Defendants' motion should be granted. Plaintiff filed
her supplemental brief on April 28, 2009. Doc. No. 78.
Defendants filed their supplemental brief on May 6, 2009. Doc.
No. 81. Accordingly, the pleadings are now closed and
Defendants' motion is ready for disposition. For the reasons
that follow, the Court concludes that Defendants' motion to
dismiss is well-taken and, it is, therefore **GRANTED**. The
complaint is **DISMISSED WITH PREJUDICE.**

## I. Summary of Evidence and Background

As originally filed, Plaintiff's complaint asserted
claims for age discrimination, reverse race discrimination,
national origin discrimination, and retaliation arising out of
her employment with U.S. Bank. Plaintiff brought her claims
pursuant to the Age Discrimination in Employment Act, Title VII
of the Civil Rights Act of 1964, and the Ohio Civil Rights Act.
The Defendants in this case are U.S. Bank, Andy Alvey, the
operations manager of Plaintiff's division, and Stephanie "Angie"
Clemons, Plaintiff's direct supervisor. Plaintiff sued Alvey and
Clemons for their alleged individual acts of discrimination and
retaliation pursuant to the Ohio Civil Rights Act.

The factual background of the case is set forth in the
Court's order granting in part and denying in part Defendants'
motion for summary judgment. Doc. No. 63. The Court, therefore,
will only attempt to summarize the case at this time.

Plaintiff was a work coordinator, or "lead," in U.S. Bank's Retail Lockbox Department. The Retail Lockbox Department processes remittances and payments from customers of U.S. Bank's clients. As a lead, Plaintiff was in a supervisory position and one of her responsibilities was to verify cash remittances submitted by customers. U.S. Bank had a detailed procedure for handling cash and one of the steps which Plaintiff admittedly failed to follow on six different occasions was initialing the cash deposit ticket. U.S. Bank terminated Plaintiff's employment on June 24, 2006, purportedly because of these repeated cash handling errors. Plaintiff, of course, claims that she was terminated because of age discrimination.[1]

Defendants' first request for production of documents asked Plaintiff to "[p]roduce all documents that refer to, reflect, comment on, or relate in any way to the Bank, Alvey, and Clemons." Doc. No. 27-2, at 2. During her deposition, taken on March 10, 2008, counsel for Defendants asked Plaintiff about her production of documents pursuant to their request:

> Q. Did you look through your records to find any documents you had that would respond to the questions that the Defendants asked as far a documents?
>
> A. Yes, I looked through everything, but I didn't have anything at home, other than—did I look today?

---

[1] Plaintiff's claims for race and national origin discrimination and retaliation were dismissed on summary judgment.

Q. No, no, not today.

A. When this was requested?

Q. Yes, um-hmm.

A. Yes.

Q. After you filed your lawsuit?

A. Yes.  I tried to find whatever I thought pertained
to this situation, and gave it to my lawyer, as well
as sending it into the Unemployment Bureau.

Q. Okay.  Did you find anything that you didn't think
was relevant that you didn't give to your lawyer or
the Unemployment Bureau?

A. Not to my knowledge, no. ma'am.

Q. <u>So anything you think you had relating to the bank,</u>
<u>or at the time you worked for the bank, you've</u>
<u>already provided?</u>

A. Yes, ma'am.

Plaint. Dep. (Doc. No. 47) at 13-14 (emphasis added).

On August 22, 2008, Plaintiff took the deposition of

Elizabeth Byrd.  Byrd, as indicated in the summary judgment

order, is a fact witness to the phone conversation in which

Clemons allegedly said "ding dong, the wicked old witch

is dead" in reference to Plaintiff's termination.  During Byrd's

deposition it came to light, for reasons not relevant here, that

Plaintiff was in possession of a list of U.S. Bank employees,

their addresses, phone numbers, Social Security numbers, and

dates of their raises which she had surreptitiously obtained from

her supervisor's desk. Byrd Dep. at 20-26.  Immediately after

Byrd's deposition, counsel for Defendants requested Plaintiff's counsel to promptly return U.S. Bank documents that she had in her possession. Plaintiff did not return these documents to U.S. Bank until September 21, 2008. It is not disputed that Plaintiff did not produce these documents pursuant to U.S. Bank's original request for production of documents or that U.S. Bank did not learn that Plaintiff had these documents until Byrd mentioned them in her deposition.

Defendants also inquired about Plaintiff's income during her second deposition, taken on June 22, 2008:

> Q. Any other sources of income, other than—I know you get German Social Security.
>
> A. I don't get that yet.
>
> Q. Any other income? Do you have a business on the side or anything?
>
> A. No.

Plaint. Dep. (Doc. No. 48), at 293-94. Later in the deposition, in response to a question whether she lives by herself, Plaintiff stated:

> I have a young man that is staying in my home helping me with keeping up the house.
>
> . . .
>
> I used to work with him at Best Buy, and his parents went to a nursing home, and he didn't have a place to go. He cuts the grass, and helped me when is was laid up.

Id. at 279. Elizabeth Byrd, however, testified in her deposition that Plaintiff has as many as four boarders in her home and that

5

she receives as much as $1,250 per month in rental income from these tenants. Byrd Dep. at 28-34.

Byrd also testified in her deposition that Plaintiff offered to pay her daughter, Maureen Mitchell, to testify on Plaintiff's behalf in these proceedings. Mitchell, it will be recalled from the Court's summary judgment order, was the other party to the phone conversation when Clemons allegedly made the "wicked old witch" comment. In her deposition, Byrd stated that Plaintiff did not offer a specific amount that she would pay Mitchell because Byrd cut short the conversation. Byrd Dep. at 37-38. During the evidentiary hearing, however, Byrd testified that Plaintiff described the amount she was willing to pay as "life changing." Doc. No. 73, at 31-33. Byrd also testified that Plaintiff said the amount she would pay "was more than in [my] lap." According to Byrd, "more than in [my] lap" was a reference to a time when she helped Plaintiff make a large cash deposit at the bank, apparently of her rent monies. Plaintiff was confined to a wheelchair at the time and had the money sitting in her lap while they were in the bank. When Byrd asked her how much money she had, Plaintiff responded that "there was a rule about $10,000. If you put money in the bank, the IRS will not ask for what did you get this money for." Id. at 32-33. The implication from Byrd's testimony is that Plaintiff was offering to pay Mitchell in the neighborhood of $10,000 for her testimony.

6

Byrd emphatically rejected the suggestion that Plaintiff was joking or that she was really only offering to pay the standard witness fee. Byrd Dep. at 38-39; Hearing Transcript (Doc. No. 73), at 34.

Finally, Defendants argue that Plaintiff has been untruthful about her employment history. Defendants point out that in her deposition, Plaintiff testified that she had only ever been discharged from her employment with K-Mart. Plaintiff Dep. at 20-22; 28-29. However, Byrd testified in her deposition that Plaintiff was terminated from jobs with Toy-R-Us and Service Merchandise. Byrd Dep. at 59-60.

On October 10, 2008, Defendants filed a motion to dismiss Plaintiffs' complaint with prejudice pursuant to the Court's inherent authority on the grounds that Plaintiff is litigating the case in bad faith and attempting to subvert the judicial process through the conduct described above. Elizabeth Byrd's deposition testimony forms the backbone of Defendants' motion; however, as the Court noted in its summary judgment order, Byrd's hostility toward Plaintiff is plainly evident from the transcript. Therefore, the Court held an evidentiary hearing on Defendants' motion not only to judge Byrd's credibility, but also to provide Plaintiff an opportunity to present her version of events and/or explanations which might mitigate the seriousness of the conduct charged by the Defendants. Plaintiff,

however, did not testify at the hearing nor has she submitted an affidavit in response to the motion. Therefore, both Byrd's deposition testimony and her hearing testimony stand unrebutted.

Having had the opportunity to observe Ms. Byrd, the Court finds that she is a credible witness. While Byrd clearly is hostile toward Plaintiff, the Court found her to be forthright and believable. Moreover, as Defendants point out in their supplemental memorandum, Byrd's deposition testimony was corroborated by subsequent events. For instance, Byrd testified that Plaintiff had secretly obtained a list of U.S. Bank employees from her supervisor's desk and, as a result, Plaintiff was compelled to produce this list to Defendants.[2] Additionally, in contrast to Plaintiff's deposition testimony that she has no other source of income, Byrd testified that Plaintiff receives substantial monthly income from renting out rooms in her house. Byrd also testified that Plaintiff submits posts to a bulletin board on cincymoms.com under the pseudonym "notwithme." This website corroborates Byrd's testimony that Plaintiff receives monthly income from renting out her home. E.g. Doc. No. 27-8, at 3. Byrd also testified that Plaintiff admitted that she was not reporting rental income on her tax returns. Byrd Dep. at 30-32. Again, this assertion is borne out by the record because at least

_____

[2] The Court will discuss Plaintiff's withholding of this document later in the order.

some of Plaintiff's tax returns, which have been filed by
Defendants, show that Plaintiff did not report any rental income
for 2005 and 2006.  Doc. No. 81, Ex. A.

In her supplemental memorandum (Doc. No. 78), Plaintiff
argues that Byrd is not a credible witness because she admittedly
lied whether she knew of the whereabouts of Mitchell, was
inconsistent about whether or not Plaintiff offered a specific
amount of money to pay Mitchell to testify, and because she had a
motive to prevent Mitchell from testifying.  The Court, however,
disagrees with Plaintiff's assessment of Byrd's testimony.

First, in regard to Byrd's deposition testimony about
her daughter, her answers were so obviously false that it was
clear that Byrd's testimony on this point amounted to refusals to
answer, not outright falsehoods.  For instance, Byrd answered "I
don't remember" to all questions concerning the last time she saw
Mitchell, going all the way back to age 5.  E.g., Byrd Dep. at 5
("Q. Have you see her since she was five years old?  A. I don't
remember.").  In fact, after several more questions inquiring
about Mitchell, Byrd stated "I am not answering any questions
about Maureen." Byrd Dep. at 6.  This statement really clarifies
and puts into context that Byrd's "I don't remember" responses
were refusals to answer rather than falsehoods.  The Court
recognizes that it not to Byrd's credit that she refused to
answer this series of questions.  However, the Rules of Civil

Procedure provide a remedy when a deponent fails to answer a question to which Plaintiff did not resort. Fed. R. Civ. P. 37(a)(3)(B)(i) & (C) (party may move for motion to compel an answer from a deponent and adjourn the deposition before moving for an order). The main point, nevertheless, is that the Court finds that Byrd's answers to this series of questions do not diminish her credibility.

Second, the Court does not find that Byrd's hearing testimony is substantially inconsistent with her deposition testimony regarding the amount of money Plaintiff offered to pay Mitchell to testify. At her deposition, Byrd testified that Plaintiff did not state a specific amount she would pay for Mitchell's testimony because Byrd did not give her a chance to. Byrd Dep. at 37-38. At the hearing, Byrd again answered that Plaintiff did not offer a specific amount, but then she added that Plaintiff said that the amount would be "life-changing." Hearing Transcript (Doc. No. 73), at 32. During the evidentiary hearing, Byrd also added that the Plaintiff stated that the amount would be "more than in my lap." Id. When confronted with this apparent inconsistency at the evidentiary hearing, Byrd explained that she thought she was being asked whether Plaintiff was offering a specific amount, such as $10,000, $11,000, $12,000 or $14,000. Id. at 72-73. Byrd did not disavow her deposition testimony and her explanation for the apparent discrepancy was

both logical and believable.[3]

Third and finally, Byrd's alleged motive for wanting to prevent Mitchell from testifying in the case is now gone, since the alleged harmful or damaging information about her daughter came out during the evidentiary hearing. In any event, Byrd has been nothing if not vocal about her enmity toward Plaintiff and her intense desire to protect her family from becoming entangled in this lawsuit. Despite her anger toward Plaintiff, the Court still finds Byrd a credible witness.

## II. Findings of Fact

In light of the foregoing discussion of the evidence of record, the Court finds as matters of fact the following.[4] To the extent that these findings of fact may be construed as conclusions of law they are adopted as such:

> 1. Plaintiff offered to pay Maureen Mitchell to provide favorable testimony in this case. The amount Plaintiff impliedly offered to pay was substantial.

---

[3]     Oddly, counsel for Plaintiff continues to advance the argument that Plaintiff was joking and/or referring to witness fees. Byrd's testimony, however, could not be more unequivocal that Plaintiff was not joking and was not referring to paying a witness fee.

[4]     The parties disagree whether findings of misconduct must be established by a preponderance of the evidence (Defendants) or by clear and convincing evidence (Plaintiff). Clear and convincing evidence "produces in [the] mind a firm belief or conviction as to the matter at issue." 3 O'Malley, et al., FEDERAL JURY PRACTICE & INSTRUCTIONS § 104.02 (5th ed. 2000). Assuming without deciding that the clear and convincing evidence standard applies here, the Court is left with a firm belief or conviction as to the matters at issue.

Plaintiff was not joking and she was not offering to
pay Mitchell the standard witness fee.  It is
immaterial that Plaintiff may have only intended to
pay Mitchell to provide truthful testimony.  It is a
criminal violation of federal law to offer to a
person anything of a value - except a witness fee -
for or because of that person's testimony under
oath.  18 U.S.C. § 201(c)(2).  This is true even if
the offeror only seeks to elicit truthful testimony.
United States v. Blaszak, 349 F.3d 881, 886-87 (6th
Cir. 2003).  If a person may be sent to prison for
offering to pay a witness for truthful testimony,
the Court has little doubt that civil sanctions may
be imposed for the same conduct.

2. Plaintiff willfully failed to disclose documents
responsive to Defendants' discovery requests and
then lied about it during her deposition.
Defendants clearly and unequivocally requested
Plaintiff to "[p]roduce all documents that refer to,
reflect, comment on, or relate in any way to the
Bank, Alvey, and Clemons."  The document in question
- the list of U.S. Bank employees - was clearly
responsive to that discovery request.  Plaintiff
stated during her deposition that she had already
provided every document she had relating to U.S.
Bank by the time of her deposition. See, supra, at
3-4.

The Court concludes that Plaintiff willfully failed
to disclose this document because the sensitive
nature of the information it contained as well as
the surreptitious manner in which she acquired it
make it highly unlikely that she simply forgot to
produce it.  Plaintiff certainly has not claimed
that she forgot about it.  Moreover, given the
circumstances under which she acquired this
document, it is highly likely that Plaintiff was
aware that her possession of the document would
reflect very unfavorably on her credibility.

The Court rejects Plaintiff's argument that she
timely supplemented her discovery responses when she
provided this document.  The totality of the
circumstances indicate that Plaintiff only produced
the document when it came to light from Byrd that
she had this list of employees in her possession.
In other words, Plaintiff only produced this

document when she got caught possessing it.

3. Plaintiff lied during her deposition about whether she has other sources of income. Plaintiff receives substantial monthly income from tenants. Contrary to the arguments of Plaintiff's counsel, the questions regarding Plaintiff's income were not vague. The Court finds that the questions, although compound in part, were reasonably straightforward queries to elicit whether Plaintiff had any other sources of income other than her salary from U.S. Bank. See Plaint. Dep. at 293-94.[5] Plaintiff did not indicate in her deposition, nor has she claimed now, that she did not understand these questions.

Plaintiff's counsel also argues that Plaintiff was not lying because "income" is a technical term of art in the realm of the tax code. However, there is no indication in the deposition that counsel for Defendants was using the term "income" in anything other than its common and ordinary sense, i.e., receipts of money, nor is there any indication that Plaintiff answered these questions with the technical legal sense of the definition in mind. Again, Plaintiff has not filed an affidavit or statement with the Court stating that she answered these questions with a technical definition of "income" in mind.

4. Plaintiff was untruthful in her deposition about her employment history. As indicated, Plaintiff testified that she had only ever been discharged from her employment with K-Mart. Plaintiff Dep. at 20-22; 28-29. However, Byrd testified in her deposition that Plaintiff was terminated from jobs with Toy-R-Us and Service Merchandise. Byrd Dep. at 59-60.

---

[5]
Q. Any other sources of income, other than–I know you get German Social Security.

A. I don't get that yet.

Q. Any other income? Do you have any business on the side or anything?

A. No.

5. Based on findings of fact 1-4, the Court finds that Plaintiff has acted in bad faith and has engaged in deliberate misconduct in the course of discovery by withholding documents, attempting to bribe a witness, and lying during her deposition.

### III. <u>The Sanction to be Imposed</u>

Defendants move the Court to dismiss the complaint with prejudice pursuant to its inherent powers as a sanction for Plaintiff's misconduct. A district court may impose sanctions pursuant to its inherent authority "to control the litigants before it and to guarantee the integrity of the court and its proceedings." <u>First Bank of Marietta v. Hartford Underwriters Inc. Co.</u>, 307 F.3d 501, 512 (6th Cir. 2002). A court may rely on its inherent powers even where a statute or procedural rule provides sanctions for the same conduct. <u>Id.</u> at 512-13. The district court generally should consider whether the conduct could be sanctioned under all potentially applicable rules and statutes, but it is not required to do so in every case. <u>Id.</u> at 514. Resort to the court's inherent powers should generally "be reserved for those cases in which the conduct of a party or attorney is egregious and no other basis for sanctions exist." <u>Id.</u> at 516 (quoting <u>Gillette Foods v. Bayernwald Fruchteverwertung</u>, 977 F.2d 809, 813 (3rd Cir. 1992)). However, "[t]he exercise of inherent authority is particularly appropriate for impermissible conduct that adversely impacts the entire litigation." <u>Id.</u>

14

The Court is cognizant that it must tread carefully before dismissing a case as a sanction because it deprives a litigant his day in court. In <u>Freedland v. Amigo</u>, 103 F.3d 1271 (6th Cir. 1997), cited by Plaintiff in her brief, the Court indicated that an innocent party should not be punished with dismissal of his case as a result of the neglect or misconduct of his attorney. <u>Id.</u> at 1278. <u>Freedland</u>, however, is not strictly applicable in this case because any sanction that would be imposed would be for Plaintiff's own misconduct, not her lawyer's. In determining whether a complaint should be dismissed as a sanction pursuant to Rule 37, the district courts are to consider the following factors: whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; the second factor is whether the adversary was prejudiced by the party's failure to cooperate in discovery; the third factor is whether the party was warned that failure to cooperate could lead to the sanction; and the fourth factor in regard to a dismissal is whether less drastic sanctions were first imposed or considered. <u>Id.</u> at 1277. Courts also consider these factors in determining whether to dismiss a case pursuant to its inherent powers. <u>E.g.</u>, <u>Pharmacy Records v. Nassar</u>, 248 F.R.D. 507, 529-90 (E.D. Mich. 2008).

Initially, the Court finds that, pursuant to <u>First Bank of Marietta</u>, there are no rules or statutes, or combination

15

thereof, which cover the full range of misconduct at issue here.
Therefore, it is appropriate for the Court to impose sanctions
pursuant to its inherent authority.  The Rules of Civil Procedure
admittedly do apply to much of the demonstrated misconduct.  For
instance, Rule 37 applies to Plaintiff's withholding of the list
of employees and Rule 30(d)(2)[6] arguably applies to Plaintiff's
untruthful responses to questions about producing documents
concerning U.S. Bank, as well as her other untruthful responses
about her income and employment history.  The Court, however,
finds no rule that applies to attempted bribery of a witness.
Section § 201(c)(2), which serves as a useful analogy for
determining whether Plaintiff is liable for misconduct in this
case, is a criminal statute and thus is of little assistance in
ascertaining an appropriate sanction.  In any event, in this
case, the Court is more concerned with what by all appearances
was an attempt by Plaintiff to undermine the truth-seeking
function of a trial rather than with discrete violations of the
Rules of Civil Procedure.  Therefore, resort to the Court's
inherent authority to impose sanctions is appropriate in this
case.  <u>See</u>, <u>supra</u>, at 14.

   Since the Defendants are moving for dismissal of the

---

   [6]   Rule 30(b)(2) states: "The court may impose an
appropriate sanction--including the reasonable expenses and
attorney's fees incurred by any party--on a person who impedes,
delays, or frustrates the fair examination of the deponent."

complaint as a sanction, the Court must consider the four factors described in <u>Freedland</u>.

With regard to the first factor, the Court has already concluded that Plaintiff has acted in bad faith. To reiterate, the Court can find no other reasonable way to characterize Plaintiff's behavior in this case. Therefore, this factor weighs in favor of dismissal.

The second factor is whether the adversary was prejudiced by the party's conduct. In this case, whether Defendants were prejudiced by Plaintiff's misconduct is hard to quantify because the information she was concealing came to light during Elizabeth Byrd's deposition. Thus, to a large extent, Defendants were able to avoid actual prejudice – albeit fortuitously – because Plaintiff's misconduct was discovered in advance of the deadline for filing dispositive motions. However, this is not a case about missed deadlines, failure to disclose witnesses, or failure to schedule depositions, as was the situation in <u>Freedland</u>. Rather, this case involves conduct that, as Defendants aptly state, subverts the judicial process and undermines the truth-seeking function of the Court. Doc. No. 27, at 1, 7. Thus, as regards prejudice, the Court's principal concern is maintaining the integrity of the judicial system. Plaintiff's conduct in withholding documents and lying during her deposition causes substantial harm to the court system. It is

especially disturbing to the Court that Plaintiff's misconduct would not have been discovered but for the almost accidental manner in which it came to the surface in Ms. Byrd's deposition. As it was, Plaintiff's misconduct created a substantial risk of a miscarriage of justice. Accordingly, this factor favors dismissal of the complaint with prejudice.

The third factor is whether Plaintiff was warned that failure to cooperate could lead to the sanction of dismissal. In this case, there was no specific warning from the Court that conduct such as occurred here could lead to dismissal of the complaint. Nevertheless, the conduct at issue is of such seriousness that Plaintiff should have and indeed must have been aware that its discovery could lead to dismissal of the case. E.g., Pharmacy Records, 248 F.R.D. at 530 ("A party does not need formal notice to know that spoliation of evidence and misrepresentations may lead to dismissal."). Therefore, this factor favors dismissal.

The final factor for consideration is whether there are available sanctions less drastic than dismissal. "This factor reflects the concept that dismissal is a sanction of last resort and should be issued only in extreme situations." Id. The Court must also keep in mind that the goals of sanctions are to punish the offender and to deter others from engaging in similar misconduct in the future. Taylor v. Medtronics, Inc., 861 F.2d

18

980, 985-86 (6th Cir. 1988).  However, "[a] district court does
not abuse its discretion in dismissing a case, even though other
sanctions might be workable, if dismissal is supported on the
facts."  Beil v. Lakewood Eng'g & Mfg. Co., 15 F.3d 546, 552 (6th
Cir. 1994) (internal quotation marks omitted).  Lesser sanctions
would include payment of Defendants' attorney's fees and costs
and evidentiary sanctions, such as prohibiting Plaintiff from
supporting claims or opposing defenses.  But see Eagle Hosp.
Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1306
(11th Cir. 2009)("The dismissal of a party's complaint or answer,
or striking its defenses, as a sanction is a heavy punishment,
appropriate only as a last resort, when less drastic sanctions
would not ensure compliance with the court's orders.") (emphasis
added)(internal quotation marks, brackets, and ellipses omitted).

       In her supplemental memorandum, Plaintiff argues that
simply allowing the defense to probe of all of these issues
before the jury would be sufficient and that the jury should be
able to "sort through" the credibility issues presented.
Plaintiff's suggestion, however, is tantamount to imposing no
sanction at all.  At trial, Defendants would properly be entitled
to explore all of these areas of misconduct with the jury because
they are probative of her credibility or lack thereof.  Simply
allowing the Defendants to do what they would be entitled to do
lets Plaintiff off scot free for her misconduct.  Similarly,

simply imposing a monetary sanction would be to let Plaintiff buy her way out of trouble and would likely be insufficient as a deterrent to others.

The Court could strike some of Plaintiff's claims for damages as a sanction. For instance, Plaintiff's improper possession of the employee list and lying on her job application and about collateral sources of income seem to relate principally to an award of front pay and whether the Defendants could establish that Plaintiff would have been terminated even in the absence of alleged discrimination. Therefore, the Court could as a sanction strike Plaintiff's claim for and entitlement to recover front pay damages in the event of a finding of discrimination.

This sanction, however, leaves unpunished Plaintiff's offer to bribe Maureen Mitchell. Mitchell would have been a liability witness because according to Byrd, she had knowledge about some of the alleged mistreatment Plaintiff was allegedly subjected to while working at U.S. Bank. Byrd Dep. 39-57. The Court sees no punitive value in prohibiting Mitchell from testifying in this case, however. By all appearances, Mitchell is unwilling to voluntarily testify at trial and there is no indication that Plaintiff intends to subpoena Mitchell to

testify.[7]  Therefore, this too is an empty sanction.

In the end, dismissal of the complaint with prejudice is the only appropriate sanction in this case because it is the only sanction that both reaches all of the misconduct that has been proven and which has any teeth.  It would be easy to parse out each of the individual instances of misconduct and discount their seriousness and the effect on trial that each would have. Viewed as a whole though, Plaintiff's conduct appears to have been a cynical and calculated attempt to influence the outcome of the trial and, as the Defendants accurately state, subvert the judicial process, by bribing a witness and withholding important evidence from the jury.  Those who seek justice must do justice. Plaintiff has failed to do justice to the Defendants and has exhibited the utmost disregard for the judicial system. Therefore, dismissal of the complaint with prejudice is the only reasonable sanction for Plaintiff's misconduct.

## Conclusion

Accordingly, Defendants' motion to dismiss is well-

---

[7]    It could be argued that Plaintiff did not subpoena Mitchell because Byrd refused to disclose her whereabouts. Plaintiff, however, could have hired an investigator to find Mitchell and the Court doubts that it would have been that difficult to track her down.  Additionally, the Court notes in passing that the fact that both Mitchell and Byrd were unwilling to voluntarily testify on Plaintiff's behalf in this case makes it all the more likely that there was a bona bide offer by Plaintiff to pay Mitchell for her testimony.

taken and is **GRANTED.** The complaint is **DISMISSED WITH PREJUDICE.**
The Court will address Defendants' motion for sanctions (Doc. No.
67) in a separate order.

        **IT IS SO ORDERED**

Date<u> May 28, 2009 </u>     <u>      s/Sandra S. Beckwith     </u>
                          Sandra S. Beckwith
              Senior United States District Judge